UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>　　　　　Plaintiff,<br>　　v.<br>APPROXIMATELY $94,600 IN U.S. CURRENCY,<br>　　　　　Defendant. | Case No. 17-cv-07279-DMR<br><br>**ORDER GRANTING MOTION FOR DEFAULT JUDGMENT**<br>Re: Dkt. No. 15 |

The United States of America (the "government") filed this *in rem* civil forfeiture action against Defendant Approximately $94,600.00 in United States Currency (the "Currency"). [Docket No. 1 (Compl.)]. Default was entered against the Currency. [Docket No. 14 (Entry of Default)]. The government now moves for a default judgment. [Docket No. 15 (Mot.).] The court determines that this matter is appropriate for resolution without a hearing. Civ. L.R. 7-1(b). For the reasons stated below, the court grants the government's motion for default judgment.

## I. BACKGROUND

### A. Factual Allegations

On August 3, 2017, Drug Enforcement Administration ("DEA") Task Force agents observed Regina Bernice Bivens deplaning at San Francisco International Airport ("SFO") from United Airlines Flight #842, which was arriving from Louis Armstrong International Airport in New Orleans, Louisiana. [Docket No. 1 (Compl.) ¶ 7]. Bivens had purchased a first-class one-way ticket to SFO less than 24 hours earlier, and had two carry-on items and no checked luggage. *Id.* at ¶¶ 8, 9.

According to the DEA, Bivens had an extensive criminal record including drug-related arrests for drug trafficking, possession of a controlled substance, possession of crack cocaine for

sale, and driving under the influence of drugs. Compl. at ¶ 10. She also had several felony convictions including possession of a controlled substance. *Id*. Additionally, the California Department of Motor Vehicle records showed that Bivens had a valid California driver's license under her actual name, Regina Bivens, but had recently applied for and obtained a driver's license under a different name. *Id*. at ¶ 11. The second driver's license had her photograph and fingerprint, but a different name on the signature line. *Id*.

Upon her arrival at SFO, Bivens passed DEA Task Force Agent ("TFA") Robert Kett and DEA Special Agent Austin Curnow as she walked alone toward the airport exit. *Id*. at ¶ 12. Kett called out, "Miss Bivens," and Bivens slowed down. *Id*. Kett and Curnow, who were in plain clothes, approached Bivens, identified themselves as law enforcement officers and displayed their credentials. *Id*. Kett advised her that she was not under arrest and was free to go, and asked if he could talk to her, to which Bivens replied, "Sure, what's this all about." *Id*. Kett asked Bivens to provide identification to confirm her identity. *Id*. Bivens agreed and produced a California driver's license in the name of Regina Bernice Bivens. *Id*.
Kett next asked her a series of questions about her trip and California residency. He inquired whether she currently resided in California, how long she had been gone for her trip, and if she still lived at the San Mateo address listed on her driver's license. *Id*. at ¶¶ 13-14. Bivens responded that she currently resided in California, had only been gone for a couple of days to Louisiana, and had not lived at the San Mateo address in a long time. *Id*. He then asked why she listed her old address on a recent driver's license application that she had submitted under a different name. *Id*. at ¶ 14. Biven apparently did not respond to his question, and appeared surprised that Kett knew about the second driver's license. *Id*. Kett asked Bivens if she had ever been arrested, to which she replied, "Oh, god no." *Id*. at ¶ 15.

Kett then asked Bivens for consent to search her carry-on luggage for illegal drugs or contraband, to which she replied that she wanted to talk to her attorney and stepped away to make a call. *Id*. at ¶ 16. Meanwhile, Kett advised Bivens that he intended to detain her luggage pending further investigation and placed her luggage between several luggage bags roped off from the public. *Id*.

DEA TFA Blake Molyneux then had a certified narcotics detection canine "Mannix" conduct an off-leash search of the area. Compl. at ¶ 17. Mannix alerted directly and only to Bivens's luggage. *Id*. Mannix's response indicated that a narcotics odor was emanating from her bag. *Id*. Mannix had searched the same area earlier, and had not alerted to any odors at that time. *Id*.

Bivens then advised the agents that she had spoken with her attorney, who had advised her to allow the agents to search her luggage. *Id*. at ¶ 18. When asked if she was giving the agents consent to search her bag, Bivens responded, "Yes I am, you can search it." *Id*. Kett asked her if she packed the bag, to which Bivens responded, "Yeah, it's all my belongings." *Id*. at ¶ 19. Bivens then opened the bag unprompted. *Id*. at ¶ 20. Inside the bag were men's jeans and shorts, women's jeans, and baby clothing. *Id*. Curnow removed the clothing and observed large amounts of U.S. currency stuffed inside the pockets of the men's and women's clothing. *Id*. Kett then saw Bivens, sitting close by, place a pair of men's shorts under her legs. *Id*. at ¶ 22. He asked her for the shorts, to which she responded, "Oh, I didn't realize I had did that." *Id*. The pockets of the shorts were stuffed with currency. *Id*.

Kett asked Bivens how much currency was in her possession, to which she responded, "Oh about $40,000." *Id*. at ¶ 21. Curnow then located two zippered compartments inside the bag, each of which was stuffed with U.S. currency. *Id*. at ¶ 23. Upon seeing the cash, Bivens responded, "Fuck, there was more money in there?" *Id*. Kett told Bivens that the amount of U.S. currency in the bag appeared to be more than $40,000 to which Bivens responded that it was only $40,000. *Id*. at ¶ 24.

Bivens then explained that she had recently withdrawn $40,000 from her bank account prior to her trip. *Id*. at ¶ 25. However, subsequent investigation showed that there was no such withdrawal from her bank account. *Id*. She also stated that the money was for property she intended to purchase in Louisiana and that she had already purchased other real estate, for which she paid cash. *Id*. at ¶ 26. However, she was unable to recall basic details about her real estate purchase, including the address or street name for the property or the location of the property she intended to purchase. *Id*. When asked about her bank account, she responded that she only had

3

one account which did not have a current balance, and that she had bad credit, and used only that account. Compl. at ¶ 27. When asked about the source of the money, she asserted that she earned approximately $80,000 in 2016 for which she paid taxes, and had a part-ownership interest in a local mobile car detailing business. *Id.* at ¶ 28. None of these responses appeared to be accurate. A review of Bivens's financial records revealed that she had multiple bank accounts at various banks, including one account jointly controlled with a person who had multiple arrests for marijuana trafficking offenses including a state felony conviction for the sale and transportation of marijuana. *Id.* at ¶ 29(b).[1] Additionally, an analysis of her bank accounts showed that over $350,000 passed through her accounts in less than two years, and over 85% of the deposits were in cash. *Id.* at ¶ 30.

The agents seized the Currency, which was subsequently processed at Bank of America. *Id.* at ¶ 29(a). While the Currency was counted, DEA TFA Ariana Daggett told Kett that she and the Bank of America representative noticed a strong potent odor of marijuana from the Currency that prevented the bank from recirculating it. *Id.* at ¶ 29(a).

**B. Procedural History**

On December 22, 2017, the government filed a verified complaint to obtain the forfeiture of the Currency pursuant to 21 U.S.C. § 881(a)(6) as moneys furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of 21 U.S.C. §§ 841 and 846.[2] Compl. at ¶¶ 1, 32-34. On December 27, 2017, the Clerk issued an arrest warrant *in rem*. [Docket No. 5 (Arrest Warrant).]

On December 29, 2017, the government sent notice of the forfeiture action via first-class mail and certified mail to Bivens's attorney, David M. Michael, Esq. [Docket No. 6 (Certificate of

---

[1] The complaint has two subsequent paragraphs numbered 29. The first paragraph numbered 29 will be referred to as 29(a), the second will be referred to as 29(b).

[2] 21 U.S.C. § 841 provides in relevant part that it is unlawful for any person "knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance . . . ."

21 U.S.C. § 846 states, "[a]ny person who attempts to conspire or commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

4

Service).] The notice included the complaint for civil forfeiture, notice of the forfeiture action, including information regarding filing deadlines, and other related documents. Bivens's attorney signed a U.S. Postal Service certified mail receipt verifying that he received the notice on January 2, 2018. [Docket No. 15-1 (Lowder Decl.) ¶¶ 4, 5, Ex. A.]

Beginning on December 30, 2017, the government posted notice of the forfeiture on an official government internet site (www.forfeiture.gov) for thirty consecutive days. [Docket No. 12 (Proof of Publication of Notice of Forfeiture).] Having received no claim to the Currency or answer to the verified complaint, the government moved for entry of default. [Docket No. 13] The clerk entered default on March 14, 2018. [Docket No. 14 (Default).] On March 27, 2018, the government filed this motion seeking default judgment against the Currency. [Docket No. 15]

## II. MAGISTRATE JUDGE JURISDICTION

As an initial matter, the court must address whether it has jurisdiction to enter judgment. Under 28 U.S.C. § 636(c)(1), a magistrate judge may enter judgment in a civil action "[u]pon the consent of the parties." The term "parties" under 28 U.S.C. § 636(c)(1) includes "all plaintiffs and defendants named in the complaint—irrespective of whether the complaint has been properly served." *Williams v. King*, 875 F.3d 500, 503 (9th Cir. 2017).

In *in rem* actions such as this, the action is against the property itself. Only those who file a claim to the property are parties to the actions, and accordingly must consent to magistrate judge jurisdiction. *See United States v. Real Prop.*, 135 F.3d 1312, 1317 (9th Cir. 1998) ("[A]bsent the filing of a claim to a property subject to forfeiture, a putative claimant is not a party to the action;" it is therefore unnecessary to obtain the consent of the putative claimant to the jurisdiction of a magistrate judge prior to the entry of a default judgment against the claimant's interest in the property) (citation and internal quotation marks omitted). These principles remain undisturbed after *Williams*. *See Williams*, 875 F.3d at 504 (recognizing the principles in *Real Property* as applicable to *in rem* actions, and explaining that the "same principle[s]" did not apply to the case before it because, among other reasons, it was not *in rem*); *Keefe Kaplan Mar., Inc. v. Vessel "Cygnet,"* No. 4:17-CV-03899-KAW, 2018 WL 534300, at *2 (N.D. Cal. Jan. 24, 2018) (explaining that the Ninth Circuit "affirmed [the] narrow exception" for magistrate jurisdiction

5

consent described in *Real Property* for *in rem* forfeiture proceedings).

Applying these principles, this action is *in rem* against the Currency. Notice was provided to all putative claimants, and no one has filed a claim to the Currency. The only party in this action is the government, which has consented to this court's jurisdiction pursuant to 28 U.S.C. § 636(c)(1). Therefore, this court has jurisdiction to enter default judgment. *See, e.g., Keefe Kaplan Mar., Inc.*, 2018 WL 534300, at *2 (finding magistrate jurisdiction to enter default judgment against a vessel in *in rem* forfeiture action upon the consent of the plaintiff, which was the only party to the action).

### III. CIVIL FORFEITURE

The government brings this action under 21 U.S.C. § 881(a)(6), which provides for the forfeiture of "[a]ll moneys . . . intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter . . . ." Section 981(b)(2)(A), in turn, permits a seizure without a warrant if "a complaint for forfeiture has been filed in the United States district court and the court has issued an arrest warrant *in rem* pursuant to the Supplemental Rules for Certain Admiralty and Maritime Claims." "Forfeiture is a harsh and oppressive procedure which is not favored by the courts." *United States v. $191,910.00 in U.S. Currency*, 16 F.3d 1051, 1069 (9th Cir. 1994) (quotation omitted). The Ninth Circuit has stated that it is "particularly wary of civil forfeiture statutes, for they impose 'quasi-criminal' penalties without affording property owners all the procedural protections afforded criminal defendants." *Id.* at 1068. "[F]orfeitures should be enforced only when within both letter and spirit of the law," *United States v. Marolf*, 173 F.3d 1213, 1217 (9th Cir. 1999) (quotation omitted), and "forfeiture statutes are strictly construed against the government." *$191,910.00 in U.S. Currency*, 16 F.3d at 1068 (citation omitted). Accordingly, "strict adherence to procedural rules is paramount in civil forfeiture proceedings." *United States v. Twenty-Four Thousand Dollars ($24,000) in U.S. Currency*, No. 01:09-CV-2319-LRH-RJJ, 2010 WL 2695637, at *1 (D. Nev. July 2, 2010) (citing *Marolf*, 173 F.3d at 1217 (denying forfeiture because government failed to provide due notice to property owner)).

Property subject to civil forfeiture maybe forfeited under the Federal Rules of Civil

Procedure Supplemental Rules for Admiralty and Maritime Claims and Asset Forfeiture Actions ("Fed R. Civ. P. Supp.") and this District's Admiralty & Maritime Local Rules. *United States v. Real Property*, 135 F.3d 1312, 1315 (9th Cir. 1998); Admir. L.R. 1-2. Under Admiralty & Maritime Local Rule 6-1(a), "[a] party seeking a default judgment in an action *in rem* must show that due notice of the action and arrest of the property has been given . . . [t]hrough execution of process in accordance with [Fed. R. Civ. P. Supp.] G(3); and [i]n accordance with [Fed. R. Civ. P. Supp.] G(4)." Admir. L.R. 6-1(a)(1). The court must examine whether the government has strictly complied with the procedural rules governing civil forfeiture proceedings with respect to the Currency.

### A. Fed. R. Civ. P. Supp. G(2): Adequacy of the Complaint

Rule G(2) sets forth the following requirements for a complaint in "a forfeiture action *in rem* arising from a federal statute," as follows:

> [t]he complaint must:
>
> (a) be verified;
>
> (b) state the grounds for subject-matter jurisdiction, in rem jurisdiction over the defendant property, and venue;
>
> (c) describe the property with reasonable particularity;
>
> (d) if the property is tangible, state its location when any seizure occurred and—if different—its location when the action is filed;
>
> (e) identify the statute under which the forfeiture action is brought; and
>
> (f) state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial.

Fed. R. Civ. P. Supp. G(2).

The government has satisfied the requirements of Rule G(2). The government's complaint was verified by DEA TFA Robert Kett. Compl. at 8 (Verification). It states the grounds for *in rem* subject matter jurisdiction and venue under 28 U.S.C. §§ 1345, 1355(a), 1355(b), and 1395. Compl. at ¶¶ 1-2, 4. The complaint also describes the amount of currency, and states that the seizure occurred at SFO. *Id.* at ¶¶ 6, 7. Furthermore, the complaint identifies that the forfeiture action is being brought under 21 U.S.C. 881(a)(6), and provides sufficient facts as described above

7

1 regarding the suspicious nature of the Currency to support a reasonable belief that the government
2 can meet its burden of proof at trial. Compl. at ¶¶ 7-30.

### B. Fed. R. Civ. P. Supp. G(3): Judicial Authorization and Process

Rule G(3) governs judicial authorization and process. It provides that "[i]f the defendant is not real property, the clerk must issue a warrant to arrest the property if it is in the government's possession, custody, or control." Fed. R. Civ. P. Supp. G(3)(b)(i). In the present case, the clerk issued a valid arrest warrant on December 27, 2017. Arrest Warrant.

Moreover, under Rule G(3), "[t]he warrant and any supplemental process must be delivered to a person or organization authorized to execute it," including "someone under contract with the United States." Fed. R. Civ. P. Supp. G(3)(c)(i). Here, the certificate of service states that a paralegal within the Asset Forfeiture Unit of the United States Attorney for the Northern District served the relevant documents in this case by first class mail and certified mail upon Bivens's attorney. Certificate of Service; *see also* Louder Decl., ¶ 3. Accordingly, the government has complied with Rule G(3).

### C. Fed. R. Civ. P. Supp. G(4): Notice

Rule G(4) requires the government to provide both general notice to the public and direct notice of the forfeiture action to any known person who reasonably appears to be a potential claimant. Fed. R. Civ. P. Supp. G(4)(a), (b).

#### a. Notice by Publication

Rule G(4)(a)(ii) provides that "a published notice must: (A) describe the property with reasonable particularity; (B) state the times under Rule G(5) to file a claim and to answer; and (C) name the government attorney to be served with a claim and answer." Here, the notice published by the government describes the amount of currency ($94,600.00), and location of its seizure (SFO), and states that claims and answers under Rule G(5) must be brought within 60 days from the first day the notice is published. It names Gregg W. Lowder as the government attorney to be served with the claim and answer. Proof of Publication of Notice. Thus, the government has satisfied the requirements of Rule G(4)(a)(ii).

Rule G(4)(iii) sets forth the requirements for the frequency of publication. A published

1  notice must appear either once a week for three consecutive weeks or need only appear once, if
2  notice of nonjudicial forfeiture is published on an official internet government forfeiture site for at
3  least 30 consecutive days before the action is filed. Fed. R. Civ. P. Supp. G(4)(a)(iii)(A), (B). As
4  to the means of publication, Rule G(4)(a)(iv) provides that the notice may be published by
5  "posting [it] on an official internet government forfeiture site for at least 30 consecutive days."
6  Here, the government's verified complaint was published on an official government forfeiture site
7  (www.forfeiture.gov) for 30 consecutive days, from December 30, 2017 to January 28, 2018.
8  Proof of Publication of Notice. Therefore, the government's published notice complied with the
9  requirements of Rule G(4)(a)(iii)(A) and G(4)(a)(iv)(C), as its 30-day posting satisfied the
10 requirement of appearing once a week for three consecutive weeks and remained on the site for at
11 least 30 consecutive days.

### b. Notice to Known Claimants

Rule G(4)(b) sets forth the requirements for notice to known potential claimants. It states that "[t]he government must send notice of the action and a copy of the complaint to any person who reasonably appears to be a potential claimant on the facts known to the government before the end of the time for filing a claim under Rule G(5)(a)(ii)(B)." Fed. R. Civ. P. Supp. G(4)(b)(i). The notice must state "(A) the date when the notice is sent; (B) a deadline for filing a claim, at least 35 days after the notice is sent; (C) that an answer or a motion under Rule 12 must be filed no later than 21 days after filing the claim; and (D) the name of the government attorney to be served with the claim and answer." Fed. R. Civ. P. Supp. G(4)(b)(ii).

Here, the government complied with this rule by sending notice of the action and a copy of the complaint to the potential claimant, Bivens, via her attorney on December 29, 2017. Certificate of Service. The mailed notice included copies of the complaint, notice of this forfeiture action, the arrest warrant, and other related documents. [Docket No. 3 (Notice of Forfeiture Action).] As to the sufficiency of the notice sent by the government, it indicates that it was sent on December 29, 2017. It provides a 35-day deadline for filing a claim and a 21-day deadline for submitting an answer or a motion under Rule 12. It lists Gregg W. Lowder as the government attorney to be served with the claim and answer. Notice of Forfeiture Action.

Finally, Rule G(4)(b)(iii)(A) provides that "[t]he notice must be sent by means reasonably calculated to reach the potential claimant." Here, the government sent the notice to Bivens's attorney via first class mail and certified mail on December 29, 2017. Certificate of Service. Bivens's attorney confirmed receipt of the documents on January 2, 2018. Lowder Decl. ¶¶ 4, 5, Ex. A. Additionally, on February 2, 2018, Bivens's attorney sent an email to the government attorney informing him that Bivens was declining to file a judicial claim in this action. *Id*. ¶ 6. The government has thus satisfied the requirements of Rule G(4)(b).

In sum, the government has adhered to the procedural rules governing civil forfeiture actions as required by federal statute, the Supplemental Rules for Certain Admiralty and Maritime Claims, and the Admiralty Local Rules. The court now addresses whether default judgment is warranted.

## IV. DEFAULT JUDGMENT

Federal Rule of Civil Procedure 55(b)(2) permits a court to enter a final judgment in a case following a defendant's default. *Shanghai Automation Instrument Co. v. Kuei*, 194 F. Supp. 2d 995, 999 (N.D. Cal. 2001). Whether to enter a judgment lies within the court's discretion. *See Pepsico, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1174 (C.D. Cal. 2002) (citing *Draper v. Coombs*, 792 F.2d 915, 924-25 (9th Cir. 1986) ("A defendant's default does not automatically entitle the plaintiff to a court-ordered judgment.")).

Before assessing the merits of a default judgment, a court must ensure the adequacy of service on the defendant, as well as confirm that it has subject matter jurisdiction over the case and personal jurisdiction over the parties. *See In re Tuli*, 172 F.3d 707, 712 (9th Cir. 1999). If the court finds these elements satisfied, it turns to the following factors ("the *Eitel* factors") to determine whether it should grant a default judgment:

> (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action[,] (5) the possibility of a dispute concerning material facts[,] (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

*Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986) (citation omitted). In this analysis, "the well-pleaded allegations of the complaint relating to a defendant's liability are taken as true," with

the exception of allegations regarding damages. *PepsiCo, Inc.*, 238 F. Supp. 2d at 1175 (citing *Televideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917-18 (9th Cir. 1987)). Nevertheless, default does not compensate for essential facts not within the pleadings and those legally insufficient to prove a claim. *Cripps v. Life Ins. Co. of N. Am.*, 980 F.2d 1261, 1267 (9th Cir. 1992).

First the court will address subject matter jurisdiction and *in rem* jurisdiction. The court will then examine the *Eitel* factors to determine whether default judgment is appropriate.

### A. Subject Matter Jurisdiction and In Rem Jurisdiction

The court has subject matter jurisdiction over this action under 28 U.S.C. § 1355(a), which provides district courts with "original jurisdiction . . . [over] any action or proceeding for the recovery or enforcement of any . . . forfeiture . . . incurred under any Act of Congress . . . ." *See also* 28 U.S.C § 1345 (vesting district courts with original jurisdiction "of all civil actions, suits or proceedings commenced by the United States."). Venue in this district is proper under 28 U.S.C. §§ 1355(b)(1)(A) and 1395(b), as the Currency was seized and is found in the Northern District of California. *See* 28 U.S.C. § 1355(b)(1)(A) (forfeiture action may be brought in "the district court for the district in which any of the acts or omissions giving rise to the forfeiture occurred."); 28 U.S.C. § 1395(b) ("A civil proceeding for the forfeiture of property may be prosecuted in any district where such property is found.").

This court must also determine whether it has jurisdiction over the Currency. *See In re Tuli*, 172 F.3d at 712. *In rem* jurisdiction treats an item of property as a person against whom suits can be filed and judgments can be entered. *United States v. $29,959.00 U.S. Currency*, 931 F.2d 549, 551 (9th Cir. 1991). The Ninth Circuit relies on a plain reading of 28 U.S.C. § 1355(b) as the appropriate jurisdictional test for *in rem* proceedings. *United States v. Approximately $1.67 Million (US) in Cash, Stock & Other Valuable Assets*, 513 F.3d 991, 996 (9th Cir. 2008). That statute provides that "[a] forfeiture action or proceeding may be brought in the district court for the district in which any of the acts or omissions giving rise to the forfeiture occurred." 28 U.S.C. § 1355(b)(1)(A). Therefore, *in rem* jurisdiction exists if the Currency was seized within this district. Since the Currency was seized at SFO, which is located within the Northern District of California, the district court has *in rem* jurisdiction over the Currency. Compl. at ¶ 4.

11

**B. *Eitel* Factors**

The first *Eitel* factor examines whether the government will suffer prejudice if the court does not enter a default judgment against the Currency. *Eitel*, 782 F.2d at 1471. Courts have found prejudice where the plaintiff will be without a means for recourse if the defendant fails to appear or defend against the suit. *PepsiCo, Inc.*, 238 F. Supp. 2d at 1177. Here, no party has attempted to oppose the verified complaint or otherwise make a claim against the Currency. In fact, the potential claimant has notified the government that she will not file a claim, and has not filed a claim. If the government's motion is not granted, it "will have no other opportunity to establish its right to the Currency pursuant to the verified complaint." *United States v. Approximately $50,000 in U.S. Currency*, No. 4:17-CV-00478-HSG (DMR), 2017 WL 3616443, at *6 (N.D. Cal. Aug. 7, 2017), report and recommendation adopted, No. 17-CV-00478-HSG, 2017 WL 3605224 (N.D. Cal. Aug. 22, 2017). Therefore, the first factor weighs in favor of default judgment.

The second and third *Eitel* factors address the merits of a plaintiff's substantive claim and the sufficiency of the complaint. *Eitel*, 782 F.2d at 1472. In analyzing these factors, the court accepts as true all well-pleaded allegations regarding liability. *See Fair Hous. of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002).

As noted, 21 U.S.C. § 881 provides for the forfeiture of money "furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter." 21 U.S.C. § 881(a)(6). Here, the government's allegations, accepted as true, show that the Currency is subject to forfeiture under 21 U.S.C. § 881(a)(6), as the government asserts that the Currency was related to drug trafficking. *See generally* Compl. Evidence supporting this conclusion includes the fact that Mannix, the narcotics detection canine, gave an alert upon detecting the odor of controlled substances in Bivens's luggage bag, and not to other luggage bags in the same area. Compl. at ¶ 17. The Ninth Circuit has held that the alert provided by a narcotics-detection canine is "an important factor in determining probable cause," and provides evidence of a link between seized money and controlled substances. *United States v. Currency, U.S. $42,500*.00, 283 F.3d 977, 982-83 (9th Cir. 2002). Additional facts in the verified

complaint also support the conclusion that the funds were related to drug trafficking. These facts include the manner in which the Currency was packed in Bivens's luggage; Bivens's attempt to hide additional currency during the agent's search of her luggage, Bivens's vague and unsupported explanations for the amount of currency packed in her luggage; Bivens's extensive criminal history including drug-related arrests; Bivens's multiple bank accounts, one of which was jointly controlled by a person who had multiple arrests for marijuana trafficking offenses; the fact that over $350,000 had passed through Bivens's accounts in less than two years, and over 85% of the deposits were cash; and the strong odor of marijuana that emanated from the Currency and prevented the bank from recirculating the Currency. Compl. at ¶¶ 7-30. Therefore, there is a strong likelihood that the government would be successful on the merits. The second and third *Eitel* factors thus weigh in favor of granting default judgment.

As to the fourth *Eitel* factor, default judgment is discouraged "[w]hen the money at stake in the litigation is substantial or unreasonable" in relation to the defaulting party's conduct. *Bd. of Trs. v. Core Concrete Const., Inc.*, No. 11-2532 LB, 2012 WL 380304, at *4 (N.D. Cal. Jan. 17, 2012) (citing *Eitel*, 782 F.2d at 1472). Here, the Currency represents the entire amount of money actually seized, all of it believed to be related to drug trafficking. No person has come forward to challenge the forfeiture.

The fifth *Eitel* factor considers whether it is likely that the material facts of the case will be disputed by the parties. *Eitel*, 782 F.2d at 1471-72. The likelihood of dispute in this case is minimal since the potential claimant, Bivens, received notice of this forfeiture action, and affirmatively notified the government through her attorney that she did not intend to file a claim to the Currency or otherwise responded to the verified complaint.

The sixth *Eitel* factor considers whether default by the defendant may have been the result of excusable neglect. *Eitel*, 782 F.2d at 1472. In the present case, Bivens received the complaint and related documents, but affirmatively chose not to respond to this action by filing a claim. There is no indication that the default was due to her excusable neglect.

The seventh *Eitel* factor dictates that the court must take into account the strong policy favoring a decision on the merits. *Eitel*, 782 F.2d at 1472. This is the only factor that weighs

against default judgment in the present case. However, it is not dispositive. *PepsiCo, Inc.*, 238 F. Supp. 2d at 1177. In this case, no claimant has come forward to contest the forfeiture, making it impossible to obtain a decision on the merits. *See Approximately $50,000 in U.S. Currency*, 2017 WL 3616443, at \*7 (finding that the seventh *Eitel* factor did not outweigh the other six factors where there was no claimant in the case, and, as such, it was not possible to obtain a decision on the merits).

In sum, the court concludes that the *Eitel* factors favor default judgment.

## V. CONCLUSION

In light of the foregoing, the court grants the government's motion for default judgment against Defendant $94,600.00 in United States Currency, and enters judgment for the United States of America. The Currency shall be forfeited to the United States of America, and all right, title, and interest in the Currency shall be vested in the United States of America. Immediately upon receipt of this order, the government shall serve a copy of this order on all known interested parties at their last known address or through their attorneys, if known, and shall file a proof of service.

**IT IS SO ORDERED.**

Dated: May 15, 2018



Donna M. Ryu
United States Magistrate Judge